UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF NEW HAMPSHIRE


Matthew Kiman


    v.                          No. 01-cv-134-JD
                                     Opinion No. 2007 DNH 092

New Hampshire Department
of Corrections, et al.


O R D E R


Matthew Kiman, a former inmate of the New Hampshire State
Prison, brought this suit in 2001 seeking damages from the New
Hampshire Department of Corrections ("DOC") and thirteen of its
individual employees[1] for alleged violations of Title II,
Subtitle A, of the Americans With Disabilities Act ("ADA"), 42
U.S.C. §§ 12131-12134 (prohibiting disability-based
discrimination in the provision of public services).  Kiman, who
suffers from amyotrophic lateral sclerosis ("ALS"), claimed that
the defendants violated Title II by failing to properly treat his
disease and by failing to reasonably accommodate his resulting

---

[1] The individual defendants are former warden Michael
Cunningham; physical therapist Bernadette Campbell; Dr. Charles
Ward; RNC David Southard; Nurse Jeanette Hoffstede; Corporal John
Haney; and corrections officers Michael Campano, Brian Gauthier,
Michael Corrira, Michael Kenney, Brian Dunham, Michael
Poulicakos, Roger Dugre.  Kiman has sued these defendants in both
their individual and official capacities.

disability.  He also brought two state law negligence claims based on the same pattern of alleged misconduct.

This case has seen multiple rounds of appeals.  Most recently, the First Circuit vacated this court's order granting summary judgment to the defendants, and remanded the case for further consideration of the issues raised by the summary judgment motion.  See Kiman v. N.H. Dep't of Corr., 451 F.3d 274, 291–92 (1st Cir. 2006).  The parties were subsequently given an opportunity to present further briefing with respect to the issues addressed in the circuit opinion.  See Order of January 24, 2007 (document no. 75).  Mindful of the case history, which shall be more extensively rehearsed below, the court now considers the defendants' renewed motion for summary judgment, Kiman's objection, and Kiman's motion for leave to file a sur–reply.

**I.**

## A.  Factual Background

What follows is an outline of the factual predicate necessary to understand the present issues.  The factual background of this case was more thoroughly discussed in this court's previous order granting summary judgment and in the First Circuit's opinion vacating and remanding that decision.  See id.

at 276-80; <u>Kiman v. N.H. Dep't of Corr.</u>, 2005 WL 3704277, *2-*7
(D.N.H. 2005).  The record has not been re-opened on remand.

Kiman was incarcerated at the New Hampshire State Prison
from April 2, 1997, to January 8, 1998.  After serving a
consecutive sentence in Massachusetts and then entering a half-
way house in New Hampshire, Kiman was released on supervised
parole in May 1998.  On September 23, 1998, he was returned to
the New Hampshire State Prison for violating the conditions of
his parole, and remained in prison until his release on January
28, 1999.

Kiman first exhibited signs of a disability while
incarcerated in 1997.  He reported numbness and pain in his left
leg and buttocks.  Later that year, after Kiman complained of
difficulty with his left shoulder, a prison nurse sought an
assessment from the prison's physical therapist, Bernadette
Campbell.  Before that assessment could take place, however,
Kiman was sent to Massachusetts to serve his consecutive
sentence.  While Kiman was at the half-way house he saw Dr. Jay
Smith who recommended that Kiman consult a neurologist.  Kiman
was subsequently examined by Dr. Daniel Botsford, Jr.  Dr.
Botsford suspected ALS, but would not definitively diagnose
Kiman's condition until Kiman was evaluated by Dr. Mark Biletch,
a neuromuscular specialist.  While on parole Kiman missed his

appointments with Dr. Biletch and, as a result, Dr. Botsford
would not confirm an ALS diagnosis.  He did inform Kiman that he
may have muscular dystrophy.

When Kiman returned to the New Hampshire State Prison on
September 23, 1998, he was initially assigned to the Reception
and Diagnostics unit ("R&D").  New inmates are typically
quarantined in the R&D their first week in prison, but Kiman
would remain in the R&D until October 19, 1998.  Quarantine in
the R&D is designed to allow for the testing of new inmates for
infectious diseases and to assess the inmates' physical and
medical conditions.  Quarantined inmates are permitted to leave
their cells only once each day to use the shower.

While in R&D, Kiman informed the prison medical staff that
he believed he had muscular dystrophy.  He met with Campbell who
instructed him to do various therapeutic exercises.  Between
September 27, 1998, and September 30, 1998, Kiman submitted five
formal inmate request slips requesting the use of a cane because
of his difficulty walking.[2]  In one of those requests, Kiman

_____

[2]To register a formal request or a complaint, New Hampshire
State Prison inmates are required to comply with Policy and
Procedure Directive ("PPD") 1.16.  Under that directive, an
inmate with a complaint or a request must fill out an inmate
request slip.  The inmate must place the request slip in his cell
doors and wait for a corrections officer to retrieve it.
According to Kiman, although request slips were usually picked up
promptly, sometimes it would take a few days.  The request slip

specifically noted that his "right leg [is] weak and hurting due
to muscular dystrophy."  Defs' Ex. 36.  In a subsequent request,
Kiman again stressed that he has "a severe muscle deteriorating
disease and it is painful and extremely hard to get around."
Defs' Ex. 37.  Kiman was given a cane on October 2, 1998.  The
defendants cited security concerns and the need to verify Kiman's
immobility as justifications for the delay.

        During this time, Kiman was also examined by a prison nurse
who noted weakness, muscle spasms, and atrophy in his left
shoulder.  She issued Kiman a "bottom bunk" pass, which remained
in effect for the balance of his incarceration.  Nevertheless,
Kiman asserts that prison guards forced him to sleep on the top
bunk during most of his incarceration.  Kiman also claims that
despite his request to be placed in a lower tier cell, he was
often housed on the third tier, which required him to climb
stairs to get his meals.  On October 19, 1998, Kiman submitted an
inmate request slip complaining about not receiving "proper
treatment . . . for my medical condition – no exercise, I get my

_____

would then be forwarded to the appropriate prison staff member
for consideration and a copy of the request along with a response
would usually be returned to the inmate.  After receiving a
response, an unsatisfied inmate could file a grievance with the
warden, and could also appeal the warden's decision to the DOC
commissioner.  Kiman has acknowledged that he was provided with
the inmate handbook, which describes PPD 1.16, and that he was
familiar with the complaint procedure.

meds when someone decides to give them to me and now I'm being escorted around in cuffs behind my back which causes severe muscle spasm and cramping. . . .  My body is hurting and abnormally deteriorating." Defs' Ex. 50.  Campbell granted him a front handcuff pass.

The prison medical staff prescribed medications:  Trazodone to help with sleep, and Baclofen a muscle relaxant.  His first prescriptions were good from September 24 to October 24, 1998. Kiman asserts, however, that the prison staff did not consistently deliver the drugs to him.  On October 8, 1998, Kiman submitted an inmate request slip noting that he was only receiving one-fourth the dosage of Balcofen that he was taking prior to his return to prison, and that delivery of his medications was irregular.  See Defs' Ex. 41.  Kiman also requested that he be prescribed Topomax to help with pain and muscle cramping.  Kiman filed similar inmate request slips on October 9 and October 10, 1998.  See Defs' Exs. 42, 43.  Prison staff responded to Kiman's inconsistent delivery complaint by informing him that he was responsible for requesting renewals of expired prescriptions.  Dr. Charles Ward notified Kiman that he was scheduling a doctor's appointment to discuss any possible change in his prescriptions.  Although Kiman renewed his prescription for Baclofen for the October 30 through November 30,

6

1998 period, he again complained about irregular delivery of his
medication in inmate request slips dated November 8 and 23, 1998,
and also complained to medical staff during appointments on
November 11 and 17, and December 3, 1998.

In October, Kiman was transferred to the Special Housing
Unit ("SHU") after reportedly "inciting a riot" in the prison
yard.  He was housed in the SHU from October 19 to November 6,
1998, and was moved to the Closed Custody Unit ("CCU") from
November 6 to November 24, 1998.  While in the SHU, Kiman took
all meals in his cell and was only permitted to leave his cell to
use the shower or for recreation.  Kiman did not need to use any
stairs while he was in the CCU because everything was on one
level.  During this time, however, he filed several inmate
request slips reporting severe pain in his shoulder and arm, that
his condition was deteriorating due to lack of exercise, and that
he was receiving low doses of his medications.  See Defs' Exs.
56-59.  Kiman was told to report to sick call for medical
treatment.  When Kiman submitted an inmate request asking about a
consultation with Dr. Biletch, Dr. Ward initially responded that
such a consultation was unnecessary, but later granted a follow-
up request.  Campbell denied Kiman's request for access to a
weight room.

Kiman was housed in the Minimum Security Unit ("MSU") from November 24, 1998, until January 4, 1999, when he was sent back to R&D pending review of a disciplinary infraction for disruptive behavior.  While in the MSU, Kiman was permitted to retrieve his medications himself rather than awaiting their delivery.  Kiman made no requests for accommodations while he was housed in the MSU.

On January 6, 1999, Kiman submitted an inmate request complaining that, when he was transferred back to R&D, a corrections officer had taken his cane and cuffed his hands behind his back "after previously being informed of a front cuff pass and being well aware of my medical condition."  Defs' Ex. 66.  Kiman claimed that during the walk to R&D, he experienced "a seizure in my shoulder [and] back . . . which reaggravated [a] prior shoulder injury."  Id.  The R&D unit manager responded that he had been handcuffed behind his back because he did not produce his front cuff pass.  Kiman then filed a grievance with the warden claiming that the corrections officer that had transferred him to R&D had taken his front cuff pass but still insisted on cuffing him behind his back.  Defs' Ex. 67.  Finding the unit manager's response reasonable, and rejecting Kiman's allegation that the corrections officer had taken his front cuff pass, the warden dismissed the grievance.

8

Kiman also filed an inmate request reporting that he had fallen in the shower and had not received adequate care.  Defs' Ex. 68.  Although the infirmary issued Kiman a pass for a shower chair on January 6, 1999, Kiman contends that corrections officers would not allow him to use it preferring to sit in the chair themselves.  As a result of muscle spasms in his legs, Kiman fell in the shower on additional occasions, and he eventually took to sitting down in the shower to prevent such falls.  Kiman also requested an "early chow" or "slow movement" pass to make it easier for him to get his meals.  This request was denied as unnecessary because Kiman was quarantined in the R&D unit at this time and R&D inmates do not eat with the general prison population.  When Kiman was later returned to the MSU, Dr. Ward issued him an early chow pass.

On January 8, 1999, Kiman submitted an inmate request slip cataloging a number of complaints.  See Defs' Ex. 69.  He complained that he was still waiting for a consultation with Dr. Biletch, that Campbell was not giving him therapy, that muscle seizures and cramps had caused him to fall in the shower and to miss meals, that fellow inmates had to help him get into his bunk, and that he had been denied access to the weight room and to handicap accessible showers.  Dr. Ward denied Kiman's request for weight room access and informed Kiman that Dr. Biletch had to

reschedule his appointment.  Dr. Ward did not respond to the
handicap shower request because he saw that the infirmary had
granted Kiman a shower chair pass on January 6.

Kiman submitted three more inmate requests on January 16,
1999, directing two to Campbell and one to Dr. Ward.  See Defs'
Exs. 72-74.  He requested the renewal of all of his medical
passes and he complained about the lack of physical therapy.  He
also noted that due to the problems he was experiencing with his
hands, he was having difficulty maintaining proper hygiene.  He
did not, however, specifically mention any difficulties with the
showers.  Campbell responded that the medical staff were
monitoring his case closely and that she was seeing him on a
regular basis.  Dr. Ward responded that Kiman's passes would be
renewed, but again denied Kiman's request for weight room access.

On January 21, 1999, Dr. Biletch examined Kiman and
conclusively diagnosed him with ALS.  Dr. Biletch added a new
drug, Rilotek, to Kiman's medication regimen.  After the
examination, Kiman was returned to the MSU where he remained for
the last week of his incarceration.  Dr. Ward did not fill the
prescription for Rilotek because of Kiman's imminent release.

**B.  Procedural Background**

Following his release from prison, Kiman filed a complaint
with the Civil Rights Division of the United States Department of
Justice ("DOJ") pursuant to the administrative regulations
implementing Title II.  See 28 C.F.R. §§ 35.170-35.171.  After
the DOJ declined to take action on Kiman's behalf, he filed the
present lawsuit in federal court.  The district court granted the
defendants' motion to dismiss, holding that Kiman's claims were
barred by sovereign immunity because Title II was not a valid
exercise of Congress's power to abrogate the states' Eleventh
Amendment immunity.  See Kiman v. N.H. Dep't of Corr., No. 01-
134, 2001 WL 1636431 (D.N.H. 2001).

Although a split panel of the First Circuit reversed and
remanded, see Kiman v. N.H. Dep't of Corr., 301 F.3d 13 (1st Cir.
2002), an equally divided en banc court withdrew the panel
opinion, see Kiman v. N.H. Dep't of Corr., 310 F.3d 785 (1st Cir.
2002), and affirmed the district court's decision without
opinion, see Kiman v. N.H. Dep't of Corr., 332 F.3d 29 (1st Cir.
2003) (en banc).  The Supreme Court then granted Kiman's petition
for certiorari and remanded the case to the First Circuit for
further consideration in light of its holding in Tennessee v.
Lane.  See Kiman v. N.H. Dep't of Corr., 541 U.S. 1059 (2004)
(citing 541 U.S. 509 (2004) (holding that Title II constitutes a

11

valid abrogation of sovereign immunity with respect to the "class
of cases implicating the fundamental right of access to the
courts")).  The First Circuit then remanded the case back to this
court.

On remand, the parties commenced with discovery and
ultimately filed cross-motions for summary judgment.  The court
denied Kiman's motion and granted the defendants' motion, holding
that Kiman could not prove a violation of Title II.  See Kiman
v. N.H. Dep't of Corr., 2005 WL 3704277, *9-*12 (D.N.H. 2005)
("Kiman I").  Because the court ruled on the merits of Kiman's
Title II claim, it declined to revisit the question of whether
the defendants were entitled to Eleventh Amendment immunity.
Given the absence of a live federal claim, the court also
declined to exercise supplemental jurisdiction over Kiman's state
law claims.  Id. at *12.  Kiman appealed to the First Circuit.
During the pendency of that appeal, the Supreme Court decided
another ADA case involving a defendant asserting sovereign
immunity, this time arising in the prison context.  See United
States v. Georgia, 546 U.S. 151 (2006).

The First Circuit upheld certain portions of the court's
summary judgment ruling.  The circuit agreed that "Kiman has not
established that the defendants' actions regarding his diagnosis,
medical consultations, physical therapy, or medical dosages were

so unreasonable as to demonstrate that they were discriminating against him because of his disability." Kiman v. N.H. Dep't of Corr., 451 F.3d 274, 285 (1st Cir. 2006) ("Kiman II"). The circuit also held that Kiman failed to establish that the defendants violated Title II by denying him the use of his cane at certain intervals during his incarceration and by denying his request for an early chow pass. See id. at 285-86. The circuit concluded, however, that summary judgment was not appropriate on the merits of four of Kiman's Title II claims:  that the defendants unlawfully denied him access to "(1) his prescription medications, (2) a shower chair or accessible shower facilities, (3) front cuffing, and (4) lower tier and bottom bunk placements." Id. at 290. The circuit concluded that there are genuine factual disputes as to these claims and that a remand to this court was necessary. The circuit noted, however, that for the court to determine whether the factual disputes are material, it must first resolve a number of threshold issues.

First, the circuit noted that Kiman had sued the warden, the corrections officers, and the prison medical staff both individually and in their official capacities. Id. The circuit instructed this court to consider whether a Title II plaintiff can bring suit against public officials in their individual capacities. Id. (citing  extra-circuit cases holding that Title

13

II does not provide for suits against state officials in their
individual capacities).

Second, the circuit directed the court to consider whether
Kiman gave the defendants sufficient notice of his specific
grievances.  The circuit noted that it is "an open question
whether Kiman must have formally complied with the prison's
grievance procedure, in addition to any informal complaints made
to prison guards and staff, in order to pursue claims of Title II
violations against the prison."  Id.

Third, the circuit noted that the court should also address
the Eleventh Amendment immunity issue.  The circuit instructed
the court "to determine, on an issue-by-issue basis, 'to what
extent [the alleged Title II violations] also violated the
Fourteenth Amendment' and 'insofar as such misconduct violated
Title II but did not violate the Fourteenth Amendment, whether
Congress's purported abrogation of sovereign immunity as to that
class of conduct is nevertheless valid.'"  Id. at 291 (quoting
Georgia, 126 S. Ct. at 882).

Finally, the circuit noted that, if any of Kiman's Title II
claims survive summary judgment on remand, the court will be
required to assess his state law claims.  Id.  Although the
circuit held that the court's previous summary judgment ruling
was premature, it declined to intimate any view as to how the

14

court should rule on remand.  Id.  On remand, the court ruled
that discovery in the case was closed but invited the parties to
submit new briefing to address the threshold legal issues
outlined by the circuit in Kiman II.  See Order of January 24,
2007 (document no. 75).  The court specifically requested
briefing addressing sovereign immunity and the recent Supreme
Court and First Circuit precedent on the issue.

## II.

The defendants again move for summary judgment on all
claims.  Summary judgment is appropriate when "the pleadings,
depositions, answers to interrogatories, and admissions on file,
together with the affidavits, if any, show that there is no
genuine issue as to any material fact and that the moving party
is entitled to a judgment as a matter of law."  Fed. R. Civ. P.
56(c).  The party seeking summary judgment must first demonstrate
the absence of a genuine issue of material fact in the record.
See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  A party
opposing a properly supported motion for summary judgment must
present competent evidence of record that shows a genuine issue
for trial.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242,
256 (1986).  All reasonable inferences and all credibility issues
are resolved in favor of the nonmoving party.  See id. at 255.

**A.   Title II Claims**

The defendants' supplemental memoranda present two arguments
in support of their motion for summary judgment.  First, the
defendants urge the court to adopt the view of several other
circuits, holding that Title II does not provide a cause of
action against public officials in their individual capacities.
Thus, the defendants argue, the court should dismiss Kiman's
individual capacity claims.  Second, the defendants argue that
Kiman's Title II claims as to all the defendants are not
actionable because he did not adequately inform the defendants of
his need for accommodations.

Notwithstanding the court's request, in compliance with the
First Circuit opinion, that the defendants address the sovereign
immunity issue, the defendants have not presented any argument
concerning their entitlement to sovereign immunity.  Rather, the
New Hampshire Attorney General, acting on behalf of the
defendants, maintains that "no Title II violation has occurred,"
and that (contrary to the circuit's directive in <u>Kiman II</u> and
this court's January 24, 2007, order) an analysis of the
sovereign immunity issue is therefore "unnecessary."  Defendants'
Reply at 7.  By this action, the state of New Hampshire, acting
through the attorney general, <u>see</u> <u>State v. Swift</u>, 101 N.H. 340,
343 (1958), has "expressed a clear choice to submit its rights

16

for adjudication in the federal courts."  <u>New Hampshire v.
Ramsey</u>, 366 F.3d 1, 16 (1st Cir. 2004).  By expressly abandoning
the sovereign immunity defense, and submitting instead an
argument on the merits of Kiman's Title II claims, the defendants
have therefore waived the defense.  <u>Cf.</u> <u>Lapides v. Bd. of Regents
of Univ. Sys. of Georgia</u>, 535 U.S. 613, 621–23 (2002)
(recognizing that a state attorney general can waive the state's
Eleventh Amendment immunity by voluntarily invoking the
jurisdiction of a federal court).  <u>See also</u> <u>Kiman II</u>, 451 F.3d at
291 & n.19 (declining to rule on sovereign immunity without the
benefit of briefing by the parties).  Therefore, no issue remains
in this case as to sovereign immunity.

     Before considering the issues presented here, it is helpful
to begin with a brief discussion of the statutory framework.  The
ADA was designed to eliminate discrimination against persons with
disabilities in three distinct areas.  <u>See</u> <u>Buchanan v. Maine</u>, 469
F.3d 158, 170 (1st Cir. 2006).  Title I of the ADA prohibits
disability-based discrimination in employment, while Title III
prohibits discrimination in access to public accommodations, such
as hotels and restaurants.  <u>See</u> <u>Parker v. Universidad de Puerto
Rico</u>, 225 F.3d 1, 4 (1st Cir. 2000) (citing 42 U.S.C. §§ 12112,
12182, 12184).  Title II, the provision at issue here, "addresses
discrimination by governmental entities in the operation of

17

public services, programs, and activities." <u>Buchanan</u>, 469 F.3d
at 170 (citing 42 U.S.C. §§ 12131–12165).

Specifically, Title II provides that "no qualified
individual with a disability shall, by reason of such disability,
be excluded from participation in or be denied the benefits of
the services, programs, or activities of a public entity, or be
subjected to discrimination by any such entity."  42 U.S.C. §
12132.  A "qualified individual with a disability" means "an
individual with a disability who, with or without reasonable
modifications to rules, policies, or practices, . . . meets the
essential eligibility requirements for the receipt of services or
the participation in programs or activities provided by a public
entity."  42 U.S.C. § 12131(2).  State prisons "fall squarely
within the statutory definition of 'public entity,' which
includes 'any department, agency, special purpose district, or
other instrumentality of a State or States or local government.'"
<u>Pennsylvania Dep't of Corr. v. Yeskey</u>, 524 U.S. 206, 210 (1998)
(quoting 42 U.S.C. § 12131(1)(B)).

Title II was intended to fill a gap left by the
Rehabilitation Act of 1973, which prohibits disability
discrimination in state and local government programs that
receive federal assistance.  Title II extends the
nondiscrimination mandate of the Rehabilitation Act to those

18

state and local government programs that do not receive federal
funding.  See Parker, 225 F.3d at 4 n.2; Lincoln Cerpac v. Health
& Hosp. Corp., 977 F. Supp. 274, 279-80 (S.D.N.Y. 1997) ("The
legislative history of the ADA reveals that the clear
Congressional intent was to extend the Rehab Act's proscription
to all State and local government programs and services
irrespective of funding." (citing H.R. Rep. No. 101-485(II),
101st Cong., 2d Sess. 84 (1990)).  Consequently, the DOJ's
regulations implementing Title II "hew[] closely to the provision
of existing section 504 regulations."  Nondiscrimination on the
Basis of Disability in State and Local Government, 56 Fed. Reg.
35,694-01 (July 26, 1991) (codified at 28 C.F.R. pt. 35).

     In light of the parallel nature of the two statutes, the
courts refer to the case law surrounding section 504 for aid in
interpreting Title II.  See Kiman II, 451 F.3d at 285 n.10
("Because Title II of the ADA is modeled on § 504 of the
Rehabilitation Act, . . . 'we rely interchangeably on decisional
law applying § 504'" (quoting Parker, 225 F.3d at 4)).  Indeed,
Title II expressly provides that its "remedies, procedures, and
rights" are the same as those set forth in section 505(a)(2) of
the Rehabilitation Act.  42 U.S.C. § 12133 (linking to 29 U.S.C.
§ 794a(a)(2)).  In turn, section 505(a)(2) of the Rehabilitation
Act provides that its "remedies, procedures, and rights" are the

same as those set forth in Title VI of the Civil Rights Act.  29
U.S.C. § 794a(a)(2) (linking to 42 U.S.C. § 2000d).  See Barnes
v. Gorman, 536 U.S. 181, 185 & 190 n.3 (2002) (noting the linkage
of the three acts); Bragdon v. Abbott, 524 U.S. 624, 631 (1998)
(recognizing that, pursuant to a specific directive in the ADA,
the courts must "construe the ADA to grant at least as much
protection as provided by the regulations implementing the
Rehabilitation Act") (citing 42 U.S.C. § 12201(a)).

        Pursuant to another Title II provision, see 42 U.S.C. §
12134(a), (b), the Attorney General has promulgated regulations
consistent with section 504 and the other titles of the ADA.  See
28 C.F.R. pt. 35.  Among other things, those regulations "require
public entities to 'make reasonable modifications in policies,
practices, or procedures when the modifications are necessary to
avoid discrimination on the basis of disability, unless the
public entity can demonstrate that making the modifications would
fundamentally alter the nature of the service, program, or
activity.'"  Kiman II, 451 F.3d at 283 (quoting 28 C.F.R. §
35.130(b)(7)).  The regulations further require that public
entities employing 50 or more persons designate a responsible
employee to coordinate the entity's efforts to comply with the
statute, and to adopt a grievance procedure to provide prompt and
equitable resolution of complaints from disabled persons.  See 28

C.F.R. § 35.107(a), (b).  "Because Congress explicitly authorized
the Attorney General to promulgate regulations under the ADA, . .
. the regulations must [be given] legislative and hence
controlling weight unless they are arbitrary, capricious, or
plainly contrary to the statute."  Kiman II, 451 F.3d at 283 n.8
(internal quotation marks omitted).

To succeed on his Title II claims, Kiman must prove "(1)
that he is a qualified individual with a disability; (2) that he
was excluded from participating in, or denied the benefits of a
public entity's services, programs, or activities or was
otherwise discriminated against; and (3) that such exclusion,
denial of benefits, or discrimination was by reason of his
disability."  Id. at 283 (internal quotation marks omitted).


**1.  Individual Liability**

While the First Circuit has yet to consider whether Title II
provides a cause of action against individuals in their personal
capacity, this court has previously adopted the unanimous view of
the five circuits that have considered the issue and have held
that it does not.  See Abbott v. Town of Salem, No. 05-cv-127,
2006 WL 276704, at *4 (D.N.H. 2006) (citing Miller v. King, 384
F.3d 1248, 1277 (11th Cir. 2004), superseded on other grounds by
449 F.3d 1149 (11th Cir. 2006); Vinson v. Thomas, 288 F.3d 1145,

1156 (9th Cir. 2002); Garcia v. State Univ. of N.Y. Health Scis. Ctr., 280 F.3d 98, 107 (2d Cir. 2001); Walker v. Snyder, 213 F.3d 344, 346 (7th Cir. 2000), abrogated on other grounds, as recognized in Bruggeman ex rel. Bruggeman v. Blagojevich, 324 F.3d 906, 912–13 (7th Cir. 2003); Alsbrook v. City of Maumelle, 184 F.3d 999, 1005 n.8 (8th Cir. 1999) (en banc)).  As this court noted in Abbott, Title II forbids discrimination by a "public entity," and the definition of "public entity" is plainly aimed at collective units, not individuals.  See 2006 WL 276704, at *4 (citing 42 U.S.C. § 12131(1)).  No circuits have held to the contrary.

Accordingly, Kiman's claims against the defendants in their individual capacities are dismissed.  Kiman's Title II claims proceed against the DOC only.  See Suprenant v. Rivas, 424 F.3d 5, 19 (1st Cir. 2005) ("A suit against a public official in his official capacity is a suit against the governmental entity itself.").

## 2.  Notification

The defendants note that, in compliance with the Title II regulations requiring public entities to adopt grievance procedures, see 28 C.F.R. § 35.107, the New Hampshire State Prison created procedures and assigned designees for addressing

22

requests by disabled inmates.  <u>See</u> <u>supra</u> note 2 (describing the
prison's grievance procedure, PPD 1.16).  The defendants argue
that it is imperative to the DOC's efforts to maintain the
orderly and secure operation of the prison that inmates utilize
these formal grievance procedures for requesting modifications or
accommodations.  Short of strict compliance with these grievance
procedures, the defendants argue, the court should not entertain
an action for relief under Title II.

        In response, Kiman asserts that the defendants' argument,
which he casts as the affirmative defense of failure to exhaust
administrative remedies, was not properly pleaded by the
defendants and is therefore waived.  In any event, Kiman argues,
he had no legal obligation to exhaust administrative remedies
before bringing the present action.  He argues, correctly, that
the Prison Litigation Reform Act of 1995, <u>see</u> 42 U.S.C. § 1997e
(requiring administrative exhaustion), applies only to prisoners
who initiate a lawsuit while incarcerated, not to plaintiffs who
were formerly imprisoned.  <u>See, e.g.</u>, <u>James v. Hernandez</u>, 215
F.3d 541, 543 (5th Cir. 2000); <u>Greig v. Goord</u>, 169 F.3d 165, 167
(2d Cir. 1999).

        Kiman misconstrues the defendants' argument, however.  The
defendants do not base their argument on the PLRA, but rather on
Title II and its implementing regulations.  The defendants argue

that, where a prison has complied with the Title II regulations
by creating a procedural structure for addressing the concerns of
disabled inmates, it follows that only alleged Title II
violations brought to the attention of an official with the
authority to correct the problem can be actionable.  According to
the defendants, informal inmate requests, not communicated
directly to a designee with the authority to act, do not put the
prison on notice of the accommodation request.  See Kiman II, 451
F.3d at 291 (recognizing, without adopting, the argument that if
"a prison is faithful in utilizing its grievance procedure and
inmates clearly recognize that compliance with that procedure is
the only acceptable method for airing their complaints, it may
well be that a prisoner must follow that procedure before
pursuing a Title II claim").

     Kiman is correct insofar as he argues that a Title II
plaintiff need not formally "exhaust" his administrative remedies
before proceeding to federal court.  Although the First Circuit
has not ruled on this issue in the ADA context, it has ruled that
section 504 of the Rehabilitation Act does not require
exhaustion.  See Brennan v. King, 139 F.3d 258, 268 n.12 (1st
Cir. 1998).  Given its parallel nature, there is no reason to
believe that Title II would require exhaustion where section 504
does not.  Moreover, the DOJ regulations do not contemplate

24

exhaustion.  <u>See</u> 28 C.F.R. § 35.170, Apx. A (noting that
"[a]lthough § 35.107 requires public entities that employ 50 or
more persons to establish grievance procedures for resolution of
complaints, exhaustion of those procedures is not a prerequisite
to filing a complaint under this section"); <u>id.</u> § 35.172, Apx. A
("Because [Title II] does not require exhaustion of
administrative remedies, the complainant may elect to proceed
with a private suit at any time.").

        Nonetheless, the defendants are correct to the extent that
they argue that an accommodation claim under Title II requires a
request that puts the defendant on notice.  As noted above, the
Title II regulations require public entities to make "reasonable
modifications in policies, practices, or procedures" when such
modifications are reasonably necessary to avoid disability
discrimination.  28 C.F.R. § 35.130(b)(7).  In cases involving
the denial of a reasonable accommodation, "the ADA's reasonable
accommodation requirement usually does not apply unless
'triggered by a request.'"  <u>Kiman II</u>, 451 F.3d at 283 (quoting
<u>Reed v. LePage Bakeries, Inc.</u>, 244 F.3d 254, 261 (1st Cir.
2001)).

        The court agrees with the defendants that, in order for a
disabled inmate's request to put the DOC on notice, it must be
directed to a DOC official with the authority to act on the

request.  As noted above, see supra at 18–19, Title II of the ADA
is linked, via the Rehabilitation Act, to Title VI of the Civil
Rights Act.  See Barnes, 536 U.S. at 185.  In light of these
statutory links, the Supreme Court has treated Title II of the
ADA as akin to a "Spending Clause" statute, at least for the
purposes of considering the remedies available under Title II.
See id. at 185–86 (classifying section 504 of the Rehabilitation
Act and Title VI of the Civil Rights Act as "Spending Clause"
statutes because they "invoke Congress's power under the Spending
Clause, U.S. Const., Art. I, § 8, cl. 1, to place conditions on
the grant of federal funds").

     With respect to Spending Clause legislation such as Title
VI, the Supreme Court has held that a recipient of federal funds
may be held liable only "for intentional conduct that violates
the clear terms of the relevant statute, . . . and, if the
statute implies that only violations brought to the attention of
an official with power to correct them are actionable, not for
conduct unknown to any such official."  Id. at 187.  The court
agrees with the defendants that Title II is a statute that
requires such notice.

     First of all, such a notice rule would be sensible in light
of the regulations requiring that public entities employing 50 or
more persons designate a responsible employee to coordinate the

26

entity's efforts to comply with the statute.  See 28 C.F.R. §
35.107(a).  More importantly, there is helpful precedent in the
context of Title II's sister statutes.  In Wynne v. Tufts Univ.
Sch. of Med., the First Circuit held, in the context of a section
504 claim, that an academic institution "can be expected to
respond only to what it knows (or is chargeable with knowing)."
976 F.2d 791, 795 (1st Cir. 1992).  The court recognized that a
"relevant aspect of this inquiry is whether the student ever put
the medical school on notice of his handicap by making a
sufficiently direct and specific request for special
accommodations."  Id. (internal quotation marks omitted).

     In the Title I employment context, 42 U.S.C. §§ 12111-12117,
the First Circuit has further elaborated on the ADA's notice
requirement.  Like Title II, the First Circuit has noted that
claims under Title I "are analyzed under the same standards" as
claims under § 504 of the Rehabilitation Act.  Freadman v. Metro.
Prop. & Cas. Ins. Co., 484 F.3d 91, 103 n.12 (1st Cir. 2007).  In
Title I cases, the plaintiff has the burden of establishing that
he "sufficiently requested the accommodation in question."  Id.
at 102 (quoting Reed, 244 F.3d at 260).  Thus, the plaintiff must
establish (1) that his request was "sufficiently direct and
specific," and (2) that it "explain[ed] how the accommodation
requested is linked to some disability."  Id. (internal quotation

27

marks omitted).  However, in cases where the person's need for an accommodation is "obvious," the First Circuit has acknowledged that "different rules may apply."  Kiman II, 451 F.3d at 283 (quoting Reed, 244 F.3d at 261 n.7).

With respect to linking the accommodation to a disability, the "appropriate inquiry is whether [the] defendant knew or reasonably should have known" that the request was based on the plaintiff's disability.  Freadman, 484 F.3d at 103.  If the plaintiff establishes a sufficient request, he must then establish that the request is reasonable in the sense that, at least on its face, the proposed accommodation is feasible.  Id. The defendant may then rebut that showing by presenting evidence that the theoretically feasible accommodation would in fact impose an undue hardship.  Id. (citing Reed, 244 F.3d at 259).

Of course, as in any reasonableness analysis, context is crucial.  In prison cases, penological concerns, particularly those relating to security, are relevant to the reasonableness analysis.  See Kiman II, 451 F.3d at 285 (finding no Title II violation in the DOC's delay in providing Kiman with a cane); Crawford v. Indiana Dep't of Corr., 115 F.3d 481, 487 (7th Cir. 1997) (noting that security concerns "are highly relevant to determining the feasibility of the accommodations that disabled prisoners need in order to have access to desired programs and

services"), abrogated on other grounds by Erickson v. Bd. of
Governors, 207 F.3d 945 (7th Cir. 2000).

Although Title II does not have a provision like Title I
that specifically defines discrimination as the failure to make
reasonable accommodations to known physical or mental
disabilities, see 42 U.S.C. § 12112(b)(5)(A), the DOJ regulation
that requires entities to "make reasonable modifications" when
necessary to avoid disability discrimination, see 28 C.F.R. §
35.130(b)(7), appears to be derived from Title II's definition of
a "qualified individual with a disability." See 42 U.S.C. §
12131(2). Further, although Title II does not speak in terms of
"known" disabilities, and requires reasonable "modifications," as
opposed to reasonable "accommodations," it appears that its
regulations were intended to parallel Title I's reasonable
accommodation provision. Indeed, the Kiman II court noted that,
generally, "the cases construing 'reasonable accommodations' are
persuasive authority with respect to cases involving 'reasonable
modifications.'" 451 F.3d at 283 n.9 (citing McGary v. City of
Portland, 386 F.3d 1259, 1266 n.3 (9th Cir. 2004) ("Although
Title II of the ADA uses the term 'reasonable modification,'
rather than 'reasonable accommodation,' these terms create
identical standards.")).

Accordingly, the notice standard, outlined by the First Circuit in the Title I and section 504 cases as described above, applies here.  Even applying that standard, however, the record establishes a genuine dispute of material fact as to whether Kiman provided sufficient notice to the DOC with respect to all of his remaining claims except one.  The defendants concede that inmate request slips "are routed to the appropriate prison official with authority to review the request, and make the determination if it is reasonable or if an alternative accommodation can achieve the same result."  Def. Supp. Mem. at 10.  Based on the many request slips in the record, see supra at 4-10, Kiman has established that the DOC had ample notice of his disability and of his need, generally, for modifications.

Kiman's inmate request slips clearly spelled out his disability and the pains and difficulties that he experienced as a result.  Several of his inmate request slips complained about specific problems and requested specific solutions.  For instance, Kiman repeatedly complained about the inconsistent delivery of his medications.  See Kiman II, 451 F.3d at 287 ("Kiman has presented evidence supporting his assertions that he was not receiving his medication on a regular basis, that he informed prison officials, and that they did not act despite his repeated requests.").  He also used inmate request slips to

30

complain that his front cuff pass was not being honored by corrections officers, and that, despite being granted a bottom bunk pass, he needed assistance from other inmates to get into his bunk.  These request slips were sufficiently direct and specific, and it was plain that they related to Kiman's disability.

The defendants argue that Kiman did not file a single inmate request slip requesting a handicap accessible or lower tier cell. The court views this as an example of an "obvious" accommodation. Reed, 244 F.3d at 261 n.7.  Viewed in the context of the circumstances established here, where Kiman had filed multiple inmate requests describing in some detail his disability, and where it is clear that prison officials with the authority to act were well aware of Kiman's immobility because they did in fact grant many of Kiman's modification requests, it should have been obvious to prison officials that, absent some form of accommodation, it would be problematic for Kiman to be housed on a floor that would require him to regularly climb stairs. Additionally, although Kiman did not explicitly state that the stairs hindered him in his inmate request slips, he did complain about missing several meals.

The defendants counter that their evidence establishes that Kiman's immobility was not obvious.  The First Circuit has

31

already concluded, however, that Kiman has presented evidence
sufficiently establishing that he had "informed the defendants of
the serious nature of his disability and they had acknowledged,
by issuing the bottom bunk pass and cane pass, that Kiman had
mobility problems that required certain accommodations.  Yet, . .
. corrections officers nonetheless failed to respond to his
request for a lower tier or his complaint that he was being kept
on a top bunk."  Kiman II, 451 F.3d at 289-90.  The evidence that
the defendants proffer may persuade a trier-of-fact that Kiman's
disability was not as debilitating as he has claimed, but it does
not provide a basis for summary judgment.  The same is true of
the defendants' argument that there is no evidence establishing
that the denial of a front cuff pass or that the failure to
provide Kiman with his medications was the product of intentional
discrimination.  See id. at 289 (noting, with respect to Kiman's
claim that the defendants' purposefully cuffed his hands behind
his back, that the "defendants' statement that Kiman's accusation
'was found to be untrue,' without more, does not demonstrate the
absence of a triable issue of fact on this issue.").  The circuit
court concluded that, "Kiman has presented evidence establishing
factual disputes that might, depending on the resolution of [the
threshold legal issues outlined supra at 13-14], be material and,
therefore, suffice to resist summary judgment."  Id. at 290.

To the extent that the defendants argue that Kiman's Title
II claims are not actionable because he did not follow up his
request slips by filing grievances with the warden and appeals to
the commissioner, such an argument would only be relevant to an
exhaustion inquiry.  As explained above, Kiman was only required
to put a DOC official with the authority to act on notice of his
requested accommodations; he was not required to exhaust his
administrative remedies by pursuing them to their fullest extent.

As to Kiman's request for shower modifications, the record
establishes that the infirmary attempted to accommodate Kiman by
issuing him a shower chair pass.  When Kiman specifically
requested access to a handicap accessible shower two days later,
Dr. Ward declined to respond because he saw that the infirmary
had just issued the shower chair pass.  There is nothing in the
record establishing that Kiman formally complained about the
shower situation after that.  Indeed, he did not mention any
shower difficulties in the three inmate request slips he
submitted on January 16, 1999.  Thus, there was no reason for DOC
officials to believe that the shower chair pass was inadequate or
that it was not being honored by corrections officers.  The court
therefore grants the defendants' motion for summary judgment as
to Kiman's Title II claim that the defendants denied Kiman access
to a shower chair or to accessible shower facilities.

**B.  State Law Claims**

Kiman brings two state law negligence claims that parallel his Title II claims:  a claim that the DOC's medical personnel were negligent in their diagnosis and treatment of his condition, and a claim that prison staff were negligent in repeatedly failing to deliver his prescribed medications.

The defendants argue that Kiman's negligent diagnosis and treatment claim is barred by an earlier finding of this court. In the initial summary judgment ruling, this court ruled that Kiman's Title II claim of inadequate diagnosis and treatment was without merit "because the undisputed evidence establishes that the defendants responded appropriately in diagnosing and treating his ALS."  Kiman I, 2005 WL 3704277, at *9.  Although that finding was reached in the context of the Title II claim, the defendants argue that it also controls Kiman's negligent diagnosis and treatment claim.  Because the First Circuit did not disturb this finding, see Kiman II, 451 F.3d at 285 (affirming the court's Title II ruling on the alternative basis that there is no evidence to establish that the defendants' diagnosis and treatment was so unreasonable that discrimination could be inferred), the defendants argue that collateral estoppel bars re-litigation of the issue.

34

The defendants' argument is somewhat misplaced.  Collateral estoppel and res judicata may mandate a finding or a decision in one case because of a finding or a decision in an earlier separate case.  Those doctrines do not, however, apply to earlier proceedings in the same case.  See In re Justice Oaks II, Ltd., 898 F.2d 1544, 1549 n.3 (11th Cir. 1990).  Rather, it is the law of the case doctrine that is more likely to be applicable here.  See Williams v. C.I.R., 1 F.3d 502, 503 (7th Cir. 1993) (Posner, J.) ("If a final judgment had been entered, the case appealed, the judgment reversed, and the case remanded, the trial judge would be required to adhere on remand to the rulings that he had made before the case was first appealed, provided of course that they had not been set aside by the appellate court.").  It is unnecessary, however, to determine whether the law of the case doctrine governs here because there is an alternative ground that mandates summary judgment against both of Kiman's state law claims.

The defendants also argue that the court should dismiss Kiman's negligence claims because of his failure to proffer an expert to testify concerning the core elements of those claims.  In New Hampshire, claims of medical injury, including claims based on negligence, are governed by statute.  See N.H. Rev. Stat. Ann. ("RSA") 507-E:1-E:4 (2006).  The statute provides that

35

the plaintiff in a medical injury action bears the burden of
proving, through the introduction of competent expert testimony,
(1) the "standard of reasonable professional practice in the
medical care provider's profession or speciality," (2) that the
defendant breached that standard, and (3) that the plaintiff's
injuries were proximately caused by that breach.  Francoeur v.
Piper, 146 N.H. 525, 527 (2001) ("[The statute] requires a
plaintiff to provide expert testimony to prove each of the
elements supporting a claim.").

        Kiman argues that he did in fact name an expert witness, Dr.
Kent Logan, who provided a preliminary report prior to this
court's order granting summary judgment to the defendants on May
25, 2005.  As the defendants point out, however, Dr. Logan's
preliminary report came late and did not comply with the federal
rules governing expert witnesses.  See Fed. R. Civ. P.
26(a)(2)(B) (requiring an expert witness to disclose, inter alia,
all materials that form the basis of his opinions and a list of
all cases in which he has previously testified as a expert).[3]
More importantly, the opinions expressed in Dr. Logan's report

---

[3]The defendants had previously filed a motion to preclude
the expert testimony of Dr. Logan because his expert report was
late, irrelevant, and not in compliance with Rule 26(a)(2).  See
Document No. 61.  That motion was denied as moot following the
court's May 25, 2005, order awarding summary judgment to the
defendants.

are not directly relevant to the elements of Kiman's claims.  Dr.
Logan's one-page report simply confirms, apparently on the basis
of examinations he performed in 2001 and 2005, that Kiman has
progressive ALS.  His report does not purport to establish the
standard of care relevant to Kiman's claims, or that any of the
defendants breached that standard, or that Kiman's injuries were
caused by any such breaches.  Because Dr. Logan cannot testify as
an expert concerning issues not described in his report, Kiman
will be unable to present expert testimony in support of his
negligence claims.  See id. (noting that the expert report "shall
contain a complete statement of all opinions to be expressed and
the basis and reasons therefor . . .").

     Kiman cannot be heard to complain that he has not had time
to supplement his expert's report.  After having already obtained
a 45-day extension from the court, Kiman provided the defendants
with Dr. Logan's preliminary expert report nearly three weeks
after the deadline for their expert disclosure.  In the cover-
letter accompanying Dr. Logan's report, Kiman's attorney noted
that she had requested Logan to create an addendum to his report.
No addendum was ever served on the defendants.  Although Kiman
subsequently argued to the First Circuit that this court had
erred by ruling on the summary judgment motions based on an
incomplete record, the First Circuit noted that Kiman had opposed

summary judgment without filing a Rule 56(f) motion for an
extension of the summary judgment deadline.  <u>Kiman II</u>, 451 F.3d
at 282 n.7 (citing Fed. R. Civ. P. 56(f); <u>Rodriguez-Cuervos v.
Wal-Mart Stores, Inc.</u>, 181 F.3d 15, 23 (1st Cir. 1999)
("Ordinarily, a party may not attempt to meet a summary judgment
challenge head-on but fall back on Rule 56(f) if its first effort
is unsuccessful.")).  Moreover, since this case was remanded to
this court in June 2006, Kiman has not requested a re-opening of
the record or a stay of summary judgment proceedings.  In the
court's January 24, 2007 order, the parties were notified that
discovery remained closed, but that either party could file a
motion seeking discovery and a stay of summary judgment if they
wished to supplement the record.  Neither party has so moved.[4]

### III.

### Conclusion

     For the foregoing reasons, the defendants' motion for
summary judgment (document no. 41) is granted in part and denied
in part.  The defendants' motion is granted to the extent it

---

     [4]Without requesting leave to supplement the record, Kiman
attached several supplemental exhibits to his supplemental
objection to the defendants' motion for summary judgment.  None
of those exhibits, in any event, expand on Dr. Logan's
preliminary report.

seeks dismissal of the plaintiff's Title II claims against the individual defendants in their individual capacities.  The summary judgment motion is also granted as to the plaintiff's Title II claim that the defendants denied the plaintiff access to a shower chair or to accessible shower facilities and as to the plaintiff's state law negligence claims.  The defendants' motion for summary judgment is denied in all other respects.  The plaintiff's motion for leave to file a sur-reply (document no. 87) is granted, and the sur-reply was given due consideration.

SO ORDERED.

Joseph A. DiClerico, Jr.
United States District Judge

August 1, 2007

cc:  Andrew B. Livernois, Esquire
     Mary E. Maloney, Esquire
     Nancy Sue Tierney, Esquire